# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TAMPA BAY WATER, A Regional Water
Supply Authority,

      Plaintiff,

v.                                 CASE NO.: 8:07-cv-00516-SDM-MAP

AMERADA HESS CORPORATION;
ASHLAND, INC.; ATLANTIC RICHFIELD
COMPANY, individually and d/b/a
ARCO PRODUCTS COMPANY, f/k/a
ARCO PETROLEUM CO. and a/k/a ARCO;
CHEVRONTEXACO CORPORATION,
individually and as successor-in-interest to
CHEVRON CORPORATION and as
successor-in-interest to TEXACO, INC.;
CHEVRON U.S.A., INC., individually and f/k/a
GULF OIL CORPORATION, d/b/a CHEVRON
PRODUCTS COMPANY, d/b/a CHEVRON
CHEMICAL COMPANY; CITGO PETROLEUM
CORPORATION; CITGO REFINING and
CHEMICAL COMPANY, LP; COASTAL EAGLE
POINT OIL COMPANY; COASTAL OIL NEW
ENGLAND; COLORADO REFINING COMPANY;
CONOCOPHILLIPS COMPANY, f/k/a PHILLIPS
PETROLEUM COMPANY, individually and as
successor-in-interest to TOSCO CORPORATION, and
d/b/a PHILLIPS 66 COMPANY; CROWN CENTRAL
PETROLEUM CORPORATION; EL PASO
MERCHANT ENERGY-PETROLEUM COMPANY,
individually and f/k/a COASTAL REFINING and
MARKETING INC., and f/k/a COASTAL STATES
TRADING, INC.; EQUILON ENTERPRISES, LLC,
d/b/a SHELL OIL PRODUCTS US, individually and as
successor-by-merger to EQUIVA SERVICES LLC;
EQUISTAR CHEMICALS, LP; EXXONMOBIL
CHEMICAL COMPANY, INC., individually and f/k/a
MOBIL CHEMICAL COMPANY INC.; EXXONMOBIL

CORPORATION, f/k/a EXXON CORPORATION and
d/b/a EXXONMOBIL REFINING and SUPPLY
COMPANY, EXXON CHEMICAL U.S.A. and
EXXONMOBIL CHEMICAL CORPORATION;
EXXONMOBIL OIL CORPORATION;
FLINT HILLS RESOURCES, LP,
f/k/a KOCH PETROLEUM GROUP, LP;
GETTY PETROLEUM MARKETING, INC.;
GETTY PROPERTIES CORPORATION,
individually and f/k/a GETTY PETROLEUM CORP.;
GIANT YORKTOWN, INC.; GULF OIL LIMITED
PARTNERSHIP, f/k/a CATAMOUNT PETROLEUM
LIMITED PARTNERSHIP; HUNTSMAN
CORPORATION; IRVING OIL CORPORATION;
IRVING OIL, LIMITED; LUKOIL AMERICAS;
LYONDELL CHEMICAL COMPANY, individually
and f/k/a LYONDELL PETROCHEMICAL COMPANY
and f/k/a ARCO CHEMICAL COMPANY;
LYONDELL-CITGO REFINING, LP;
MARATHON ASHLAND PETROLEUM, LLC;
MARATHON OIL COMPANY; MOBIL CORPORATION;
MOTIVA ENTERPRISES, LLC, f/k/a STAR
ENTERPRISES LLC; OCCIDENTAL CHEMICAL
CORPORATION; THE PREMCOR REFINING GROUP,
INC., individually and f/k/a CLARK REFINING;
PDV MIDWEST REFINING, LLC; SABIC AMERICAS,
INC.; SHELL OIL COMPANY; SHELL OIL PRODUCTS
COMPANY; SHELL OIL PRODUCTS COMPANY, LLC;
SHELL PETROLEUM, INC.; SHELL TRADING (US)
COMPANY, individually and f/k/a EQUIVA TRADING
COMPANY and a/k/a STUSCO; SUNOCO, INC.,
individually and f/k/a SUN OIL COMPANY and f/k/a
SUN COMPANY, INC.; SUNOCO, INC. (R&M)
Individually, and f/k/a SUN REFINING and
MARKETING COMPANY and f/k/a SUN
COMPANY, INC. (R&M) TEXACO, INC.;
TEXAS PETROCHEMICAL; TEXACO REFINING &
MARKETING, INC.; TEXACO REFINING &
MARKETING (EAST), INC.; TMR COMPANY,
f/k/a TEXACO REFINING and MARKETING, INC.,
individually and as successor-by-merger to TRME
COMPANY f/k/a TEXACO REFINING and
MARKETING (EAST), INC.; TOSCO CORPORATION,
individually and as predecessor-in-interest to

CONOCOPHILIPS COMPANY, and a/k/a TOSCO
REFINING COMPANY and a/k/a TOSCO
MARKETING COMPANY; TEXAS PETROLEUM
CHEMICALS; TOTAL PETROCHEMICALS
USA, INC., f/k/a ATOFINA PETROCHEMICALS,
INC.; TPI PETROLEUM, INC.; VALERO ENERGY
CORPORATION; VALERO MARKETING AND
SUPPLY COMPANY; VALERO REFINING
COMPANY; VALERO REFINING AND
MARKETING COMPANY,

       Defendants.

_____/

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Tampa Bay Water, A Regional Water Supply Authority ("Tampa Bay Water"), by and through its attorneys, for its complaint against Defendants allege as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this action against Defendants to forestall a water quality emergency and the attendant harm created by the contamination of soil and groundwater proximate to potable water supply wells, owned and operated by Plaintiff, by Methyl Tertiary Butyl Ether ("MTBE"), a gasoline additive that was used by the Defendants. As used herein, the term "MTBE" shall include all of its degradation products, such as tributyl alcohol ("TBA"). As a result of the careless and negligent practices of Defendants, MTBE has entered into the groundwater proximate to the aquifer system from which Plaintiff draws potable water posing a significant threat of damages to Plaintiff and its customers.

2.      MTBE is highly soluble in water and does not readily biodegrade. MTBE is a possible human carcinogen, a known animal carcinogen, and very small amounts (as little as 5 parts per billion ["ppb"]) impart a foul taste and odor to water.

3.      Defendants added MTBE to their gasoline knowing it would contaminate and create a greatly enhanced risk to groundwater, as it has and continues to do. Defendants have engaged in joint efforts and have conspired to use and market MTBE as a gasoline additive for years with full knowledge of the serious threat MTBE poses to groundwater.

4.      In furtherance of this conspiracy to conceal the problems associated with MTBE, Defendants conspired to maximize their profits at the expense of (and to the detriment of) Plaintiff and the environment, to proliferate its use, to pollute the groundwater proximate to the aquifer from which Plaintiff draws its potable water, and to avoid responsibility for their contamination.

5.      Plaintiff seeks to: (a) protect the public, including but not limited to its customers, from exposure to this contamination; (b) prevent further and continuing injury to vital groundwater resources; (c) enjoin Defendants from damaging Plaintiff's vital water resource and to remediate the problem they created; (d) compel Defendants to abate the continuing nuisance by removing the contaminants from the groundwater and soil; (e) obtain testing and monitoring, and alternative water where necessary; (f) recover damages for, among other things, testing costs, remediation, or treatment costs, and damages to Plaintiff's property, including wells, pumping stations, filters, and usufructuary rights to the water drawn from the aquifers; and (g) ensure that the

Defendants, as the responsible parties - and not the Plaintiff or its customers - bear all costs.

6.     Plaintiff asserts claims for: (a) public nuisance; (b) strict liability for design defect; (c) strict liability for failure to warn; (d) negligence; and (e) private nuisance.

## JURISDICTION AND VENUE

7.     Jurisdiction lies in this Court pursuant to PL 109-58, Energy Policy Act of 2005, HR 6, Title XV, § 1503, 42 U.S.C. § 7545.

8.     Venue is proper pursuant to 28 U.S.C. §1391.

## THE PARTIES

### A.    Plaintiff

9.     Tampa Bay Water is a Regional Water Supply Authority authorized by §373.1962, §373.1963 and §163.01, Florida Statutes, and created by and Interlocal Agreement among the Counties of Hillsborough, Pasco and Pinellas and the cities of Tampa, St. Petersburg and New Port Richey, Florida ("Member Governments"). Tampa Bay Water has grown to become one of the largest suppliers of potable water in the nation, serving in excess of two million Tampa Bay residents.  It has been operating since 1974. Tampa Bay Water is acting in all respects for the benefit of its Member Governments and their citizens. Included among its powers is the power to sue and be sued and to do all things necessary or convenient for the conduct of its business in order to carry out the powers and duties provided in the Interlocal Agreement.

**B.     Defendants**

10.     Defendants do business in Florida as manufacturers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

11.     At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from the exploration for and extraction of crude oils to the refining and/or the distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE sold in Florida and other states, and the marketing and sale of MTBE.

12.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

13.     When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

14.     When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the Defendants' officers, directors, agents, employees, or representatives committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of Defendants' affairs, and did so while acting within the scope of their employment or agency.

15.     Amerada Hess Corporation is a Delaware corporation with its principal place of business at 1185 Avenue of the Americas, 40th Floor, New York, New York 10036, doing business in the State of Florida.

16.     Ashland, Inc., is a Kentucky Corporation, with its principal place of business at 50 E. River Center Blvd., Covington, KY 41011, doing business in the State of Florida.

17.     Atlantic Richfield Company, individually and doing business as ARCO Products Company (f/k/a Arco Petroleum Co.), and also known as ARCO, a subsidiary of BP America, Inc., is a Delaware corporation with its principal place of business at 4 Center Pointe Drive, La Palma, California 90623, doing business in the State of Florida.

18.     ChevronTexaco Corporation, individually and as successor-in-interest to Chevron Corporation and as successor-in-interest to Texaco, Inc., is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the State of Florida.

19.     Chevron U.S.A., Inc., individually and formerly known as Gulf Oil Corp. (d/b/a Chevron Products Company, d/b/a Chevron Chemical Company), is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Road, San Ramon, California 94583, doing business in the State of Florida.

20.     Citgo Petroleum Corporation is a Delaware corporation with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of Florida.

21.     Citgo Refining and Chemicals Company, LP, a subsidiary of Citgo Investment Company, is an Oklahoma limited partnership with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of Florida.

22.     Coastal Eagle Point Oil Company is a Delaware corporation with its principal place of business at 1-130 & 1-295, Westville, New Jersey 08093, doing business in the State of Florida.

23.     Coastal Oil New England is a Massachusetts Corporation, with its principal place of business at 1001 Louisiana Street, Houston, TX 77002, doing business in the State of Florida.

24.     Colorado Refining Co., is a Colorado Corporation with is principal place of business located at 5800 Brighton Boulevard, Commerce City, Colorado 56610, and doing business in the State of Florida.

25.     ConocoPhillips Company, formerly known as Phillips Petroleum Company, individually and as successor-in-interest to Tosco Corporation, and d/b/a Phillips 66 Company, is a Delaware corporation with its principal place of business at 600 North Dairy Ashford Road, Houston, Texas 77079, doing business in the State of Florida.

26.     Crown Central Petroleum Corporation is a Maryland corporation with its principal place of business at 1 North Charles Street, Baltimore, Maryland 21203, doing business in the State of Florida.

27.     El Paso Merchant Energy-Petroleum Company, individually and formerly known as Coastal Refining and Marketing, Inc. and formerly known as Coastal States

Trading, Inc., is a Delaware corporation with its principal place of business at 1001 Louisiana Street, Houston, Texas 77002, doing business in the State of Florida.

28.     Equilon Enterprises, LLC, d/b/a Shell Oil Products US, individually and as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at 1100 Louisiana Street, Suite 2200, Houston, Texas 77002, doing business in the State of Florida.

29.     Equistar Chemicals, LP, with its principal place of business at 1221 McKinney Street, Suite 1600, Houston, TX 77010, doing business in the State of Florida.

30.     ExxonMobil Chemical Company, Inc., individually and formerly known as Mobil Chemical Company Inc., a subsidiary of Exxon Mobil Oil Corporation, is a Delaware corporation with its principal place of business at 13501 Katy Freeway, Houston, Texas 77079, doing business in the State of Florida.

31.     ExxonMobil Corporation, f/k/a Exxon Corporation and d/b/a Exxon Mobil Refining and Supply Company, Exxon Chemical U.S.A. and ExxonMobil Chemical Corporation, is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the State of Florida.

32.     ExxonMobil Oil Corporation, a subsidiary of Mobil Corporation, is a New York corporation with its principal place of business at 800 Bell Street, Corp EMB Room 2441 Houston, Texas 77002, doing business in the State of Florida.

33.     Flint Hills Resources, LP, formerly known as Koch Petroleum Group, LP, is a Delaware Corporation, with its principal place of business at 4111 E. 37th Street North, Wichita, Kansas 67220, doing business in the State of Florida.

34.     Getty Petroleum Marketing, Inc., is a Maryland corporation with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York 1154, doing business in the State of Florida.

35.     Getty Properties Corporation, individually and formerly known as Getty Petroleum Corp., is a Delaware corporation with its principal place of business at 125 Jericho Turnpike, Jericho, New York 11753, doing business in the State of Florida.

36.     Giant Yorktown, Inc., is a Delaware Corporation, with its principal place of business at 23722 N. Scottsdale Road, Scottsdale, AZ 85255, doing business in the State of Florida.

37.     Gulf Oil Limited Partnership f/k/a Catamount Petroleum Limited Partnership is a Delaware corporation with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts 02150, doing business in the State of Florida.

38.     Huntsman Petrochemical Corporation is a Delaware Corporation with it principal place of business at 500 Huntsman Way, Salt Lake City, Utah 84108, doing business in the State of Florida.

39.     Irving Oil Corporation is a Maine corporation with its principal place of business at 700 Main Avenue, Bangor, Maine, doing business in the State of Florida.

40.     Irving Oil, Limited is a Canadian corporation with its principal place of business at 210 Crown Street/10 Sydney Street, Saint John, New Brunswick, Canada, doing business in the State of Florida.

41. LUKOIL Americas, Corp., is a New York corporation with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York 11554 doing business in the State of Florida.

42. Lyondell Chemical Company, individually and formerly known as Lyondell Petrochemical Company and formerly known as Arco Chemical Company, is a Delaware corporation with its principal place of business at 1221 McKinney Street, Suite 700, Houston, Texas 77010, doing business in the State of Florida.

43. Lyondell-Citgo Refining, LP, is a Foreign Corporation, with its principal place of business at 12000 Lawndale, Houston, TX 77017, doing business in the State of Florida.

44. Marathon Ashland Petroleum, LLC, is a Foreign Corporation, with its principal place of business at 539 South Main Street, Findlay, Ohio at 45840, doing business in the State of Florida.

45. Marathon Oil Company is an Ohio Corporation, with its principal place of business at 5555 San Felipe Road, Houston, Texas 77056-2723, doing business in the State of Florida.

46. Mobil Corporation, a subsidiary of ExxonMobil Corporation, is a Delaware corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the State of Florida.

47. Motiva Enterprises, LLC, individually and formerly known as Star Enterprises LLC, is a Delaware limited liability corporation with its principal place of

business at 1100 Louisiana Drive, Houston, Texas 77210, doing business in the State of Florida.

48.     Occidental Chemical Corporation is a New York corporation with its principal place of business at 10889 Wilshire Boulevard Los Angeles, California 90024 doing business in the State of Florida.

49.     PDV Midwest Refining LLC, is a Foreign Corporation, with its principal place of business at 135th & New Avenue, Bolingbrook, IL 60439, doing business in the State of Florida.

50.     SABIC Americas, Inc. is a Delaware corporation with its principal place of business at 2500 City West Blvd., Detec Towers, Suite 650 Houston, Texas 77042, doing business in the State of Florida.

51.     Shell Oil Company is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas 77002, doing business in the State of Florida.

52.     Shell Oil Products Company is a Delaware corporation with its principal place of business at One Shell Place, Houston, Texas 77002, doing business in the State of Florida.

53.     Shell Oil Products Company, LLC, is a Delaware limited liability corporation with its principal place of business at 500 Dallas Street, Houston, Texas 77002, doing business in the State of Florida.

54.     Shell Petroleum, Inc., which owns Shell Oil Company, is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas 77002, doing business in the State of Florida.

55.     Shell Trading (US) Company, individually and formerly known as Equiva Trading Company, and also known as Stusco, is a Delaware corporation with its principal place of business at PO Box 3075, Houston, TX 77253, and 500 Dallas Street, Houston, Texas 77002, doing business in the State of Florida.

56.     Sunoco, Inc., individually and formerly known as Sun Oil Company, and formerly known as Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company, is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27th Floor, Philadelphia, Pennsylvania 19103, doing business in the State of Florida.

57.     Sunoco, Inc. (R&M), individually and formerly known as Sun Refining and Marketing Company and formerly known as Sun Company Inc. (R&M) is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27th Floor, Philadelphia, Pennsylvania 19103, doing business in the State of Florida.

58.     Texaco, Inc., a subsidiary of ChevronTexaco Corporation, is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the State of Florida.

59.     Texaco Refining & Marketing Inc., a/k/a TRMI Holdings, is a Delaware corporation with its principal place of business at 1111 Bagby Street, Houston, Texas 77002, doing business in the State of Florida.

60.     Texaco Refining & Marketing (East), Inc., is a Delaware corporation with its principal place of business at 1111 Bagby Street, Houston, Texas 77002, doing business in the State of Florida.

61.     Texas PetroChemical is a non-registered foreign corporation with it principal place of business at 5151 San Felipe, Suite 800, Houston, Texas 77056, doing business in the State of Florida.

62.     The Premcor Refining Group Inc., individually and formerly known as Clark Refining, is a Delaware corporation with its principal place of business at 8182 Maryland Avenue, St. Louis, Missouri 63105, doing business in the State of Florida.

63.     TMR Company, formerly known as Texaco Refining and Marketing, Inc., individually and as successor-by-merger to TRMI Company, formerly known as Texaco Refining and Marketing (East), Inc., with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Florida.

64.     ToscoCorporation, individually and as predecessor-in-interest to ConocoPhilips Company, and also known as Tosco Refining Company, and also known as Tosco Marketing Company, a subsidiary of ConocoPhillips Company, is a Nevada corporation with its principal place of business at 1500 North Priest Drive, Tempe, Arizona 85281, doing business in the State of Florida.

65.     Total Petrochemicals USA, Inc., f/k/a Atofina Petrochemicals, Inc., individually and as successor-by-merger to Fina, Inc., with its principal place of business at 15710 John F. Kennedy Boulevard, Houston, Texas 08628, doing business in the State of Florida.

66.     TPI Petroleum, LLC, with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of Florida.

67.     Valero Energy Corporation, the parent company of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of Florida.

68.     Valero Marketing and Supply Company, a subsidiary of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of Florida.

69.     Valero Refining and Marketing Company is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of Florida.

70.     Valero Refining Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of Florida.

## SUMMARY OF FACTS

71.     MTBE has been detected in groundwater proximate to Tampa Bay Water's production wells.

72.      Tampa Bay Water owns and operates several wellfields, and each wellfield contains numerous potable water supply wells.  These wells have the capacity to deliver hundreds of millions of gallons of potable water each day.  Tampa Bay Water also owns and operates a surface water treatment plant that treats water from multiple surface water sources.  Thus, water delivered to Tampa Bay Water's Member Governments comes

from a "blended" water supply drawn from numerous production wells and surface water sources.

73.     Once Tampa Bay Water became aware of the potential risk of MTBE contamination of its wells, it began to test and monitor its wells for levels of MTBE.

74.     In order to insure that MTBE does not contaminate Plaintiff's supply wells, Defendants are liable for: (1) installing an early warning mechanism to notify Plaintiff when MTBE is nearing its wells; (2) implementing a wellhead protection program to ensure that Plaintiff's wells are kept permanently free from the MTBE contamination that Defendants caused; and (3) cleansing water at Plaintiff's production wells should MTBE reach them.

## **MTBE FACTS**

75.     MTBE is a member of a class of chemical compounds called aliphatic ethers, one of whose properties is that they are "hydrophilic," or water-seeking; *i.e.,* they have enhanced solubility in water and chemical attraction to water molecules.

76.     MTBE does not occur naturally.

77.     MTBE breaks down into TBA and formaldehyde.

78.     MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process. MTBE is not found in gasoline unless it is added to the gasoline.

79.     Defendants used and/or continue to use MTBE as a gasoline additive.

## WHY DEFENDANTS ADD MTBE TO GASOLINE:
## PROFIT

80.     Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

81.     MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected MTBE's choice and preference to make money from gasoline refining waste by-products.

82.     Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits.  Defendants use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify the use of MTBE. The Clean Air Act of 1990 required that oxygenates be used in gasoline.  However, Defendants chose MTBE from a list of alternatives as a less expensive means to comply with The Clean Air Act of 1990.

83.     Ironically, it is now apparent that MTBE does not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE does little or nothing to reduce such air-polluting emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no

significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.

84.    In May 1999, the National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.

85.    NAS previously concluded that reduction of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.

86.    In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself. MTBE discharged to the air contaminates groundwater because rain returns it to the soil.

## GASOLINE CONTAINING MTBE HAS WIDELY CONTAMINATED AND CONTINUES TO POSE A THREAT TO GROUNDWATER

87.    MTBE is more soluble in water than other gasoline constituents, and therefore has a stronger affinity for and dissolves more easily in any available water. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to other common gasoline components — benzene, toluene, ethylbenzene and xylene (collectively "BTEX compounds").

88.    Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the MTBE races through underground water aquifers, spreading faster

and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

89.     In addition, MTBE resists physical, chemical and microbial degradation. As a result, MTBE is slow to break down after it is released into the environment, particularly in the subsurface of the ground. Plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

90.     Even in very small quantities (MTBE is measured in water in terms of "parts per billion"), MTBE gives water a foul taste and odor that renders the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

91.     Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as one part per billion ("ppb") or lower.

92.     MTBE is also a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

### THE LONGSTANDING PREVALENCE OF UNINTENDED GASOLINE DISCHARGES ENSURES THAT GASOLINE WITH MTBE WILL CONTAMINATE GROUNDWATER

93.     Prior to the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") and other gasoline discharges were a known threat to Florida's groundwater. The introduction of gasoline containing MTBE in

steadily increasing quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs. Because of MTBE's unique properties, the addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline, as well as from rainwater.

94.     Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable by Defendants.

**DEFENDANTS HAVE KNOWN ALL ALONG THAT
MIXING MTBE WITH GASOLINE WOULD RESULT
IN MASSIVE GROUNDWATER CONTAMINATION**

95.     At all times relevant to this litigation, Defendants knew or should have known that there is a national crisis involving gasoline leaking from multiple sources, such as USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA show Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

96.     At all times relevant to this litigation, Defendants knew or should have known that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as well as other sources.

97.     At all times relevant to this litigation, Defendants knew or should have known of the potential for additional mishandling events involving gasoline used and/or stored by nearly every adult residing in the United States.

98.     At all times relevant to this litigation, Defendants knew or should have known that additional quantities of MTBE reach the soil in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

**DEFENDANTS' KNOWLEDGE OF THE THREAT TO
GROUNDWATER AS A RESULT OF UNINTENDED
DISCHARGES OF GASOLINE MIXED WITH MTBE**

99.     At all times relevant to this litigation, Defendants knew or should have known that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, resistance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

100.     For example, in or around 1980, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry, including Defendants, in a broad range of topics, formed a Toxicology Committee. The Toxicology Committee included Defendants Exxon, Mobil, Shell, Arco, Tosco, and ChevronTexaco.

101.     API's Toxicology Committee had a specific program to study MTBE. Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE through drinking water.

102. Despite early knowledge and a shared recognition of the need to do ingestion studies on the effects of MTBE, none were ever undertaken or completed by Defendants.

103. Defendants possess and have always had knowledge, resources, experience and other advantages that are vastly superior to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know or should have known of the threat which MTBE poses to groundwater.

104. In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

**A. Defendants' Early Knowledge Of Specific Instances Of MTBE Contamination Of Groundwater**

105. Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

106. In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in

water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

107.    In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by Defendant ExxonMobil, the other owned by ChevronTexaco (then Chevron), created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

108.    Defendants were aware or should have been aware of two MTBE groundwater contamination events in Liberty, New York, and East Patchogue, New York, both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

### B. Defendants' Awareness Of The 1986 Garrett Report Specifically Warning Of Inevitable MTBE Contamination Of Groundwater

109.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report"). The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be

more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

110. As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

111. As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

112. Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, with the report prior to the presentation of the first version of the paper. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and proceeded with their presentation of the paper to the National Well Water Association in November of 1986.

113. On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API forwarded the Garrett Report to members of the GTTF including

representatives of Shell, Arco, and Exxon. These individuals were asked to review the Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

114.    The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE. . . be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counter-productive.

115.    However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate.  These issues were not even addressed.

116.    Defendant BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

**C.    Defendants' Internal Documents Demonstrate Their Awareness Of MTBE Contamination Of Groundwater**

117.    Privately, however, Defendants acknowledged that the serious findings of the Garrett Report were correct. For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors,

Defendants were admitting that the authors might in fact be correct. Arco Chemical, in communications to others within the oil industry, admitted that they had no data to refute the Garrett Report's conclusions. For example, a letter dated February 4, 1987, states "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

118.    On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE.   From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

119.    Communications among officials at Defendant ChevronTexaco (then Chevron) were similar. A 1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster

than a gasoline leak that does not include MTBE as one of
its constituents.

Further compounding the problem of increased solubility,
MTBE is more difficult to remove from groundwater using
current technology (air stripping or carbon adsorption).
Because of its lower volatility, MTBE requires more than
double the air stripping capacity to reach a 95 percent
reduction. Removal using carbon adsorption is even worse.
MTBE breaks through activated carbon four times faster
than BTX.

120.     In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang

created a document entitled "MTBE WHITE PAPER - The Impact of MTBE on

Groundwater." The purpose of the document was to put together what was known about

the movement of MTBE in groundwater and the document was to be circulated internally

among the employees of the various Shell companies.

121.     According to Shell's MTBE White Paper, MTBE is nearly 25 times more

soluble than benzene and therefore, MTBE's plumes are expected to move faster and

farther than benzene plumes emanating from a gasoline spill. Further, Shell's MTBE

White Paper indicates that MTBE does not biodegrade in the subsurface environment.

Finally, Shell's MTBE White Paper indicates that MTBE has a low odor and taste

threshold and that "at many locations odor and taste criteria may determine clean-up

levels."

122.     Shell's MTBE White Paper further states:

MTBE has had an impact on groundwater management at
only a few Shell marketing terminals and service stations to
date. However, as the usage of this oxygenate begins to
increase, a stringent clean-up criteria for MTBE will
become adopted in more states, we should anticipate

> increased concerns over how its release to groundwater is
> managed.

Not surprisingly, upon information and belief this paper was never published outside of Shell.

123.    A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status" states:

> MTBE is relatively quite soluble in water (compared to
> other components in gasoline, like BTEX), and it moves
> essentially with the groundwater, thus MTBE tends to "lead
> the plume" whenever there is a gasoline spill or leak.
> MTBE also has a very low biodegradation potential, which
> makes it more difficult to remove from groundwater than
> other gasoline components such as BTEX.

124.    The threat MTBE poses to groundwater was also discussed in a May 1999 paper by employees of Defendant Chevron entitled "Solving Problems From MTBE Contamination —It's Not Just Regulating Underground Tanks." The document reads:

> [C]oncerns on the mobility and persistence of MTBE in the
> environment are reinforced by a recent study and anecdotal
> information discussed at an EPA Blue Ribbon Panel on
> MTBE in January 1999. This information indicates there is
> MTBE ground water contamination from small spills of
> gasoline (e.g., a spill in a parking lot, a car accident) —
> incidences that stand in contrast to known historical causes
> of MTBE contamination (e.g., point source discharges from
> leaking underground storage tanks). The physical and
> chemical properties of MTBE (and thus its mobility and
> persistence in the environment) differ markedly from other
> components of gasoline. These differences make MTBE
> (and other ethers and heavy alcohols) more likely to get
> into ground water and problematic to contain and clean up
> when releases occur... .
>
> * * *

> Short of eliminating car accidents, stopping customer overfilling, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment.

**D.** **Defendants' Knowledge That No Adequate Toxicity Studies Had Been Done Prior To Defendants' Decision To Add MTBE To Gasoline**

125. Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken. Studies showed MTBE caused cancer in animals. It is common knowledge within the scientific community, and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed.

**E.** **Despite Knowing That Adding MTBE To Gasoline Inevitably Results In Widespread MTBE Groundwater Contamination, Defendants Conspired To Mislead The EPA, Downstream Handlers And The Public About The Hazards Of Adding MTBE To Gasoline**

126. Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiff and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations, such as the API and the Oxygenated Fuels Association

("OFA"). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above harm to the environment and Plaintiff that was known to them but concealed from the public. Defendants manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in groundwater and wells and took affirmative steps to conceal those effects.

      **F.    Defendants Misled The EPA Into Not Testing MTBE Under TSCA in the late 1980's**

127.    In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to TSCA, recommended testing and review to assess MTBE's health and environmental risks. The ITC characterized MTBE as having relatively high water solubility, and it stated that MTBE's persistence in groundwater following spills was unknown but that it likely was not readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

128.    The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

129.    On or about December 12, 1986, Defendant Arco, speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE. Arco's comments included a critique of the Dynamac

Corporation's information review of MTBE, on which the ITC had relied. Arco stated

that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions

had been made that cause the hazards of MTBE to be seriously overestimated." In further

comments to the EPA, Arco stated the following:

> <u>Characteristics</u> — Moderate water solubility is reported.
> However, an ARCO Technical Bulletin states that *'MTBE
> is only slightly soluble in water...'*
>
> * * *
>
> The CRSC/Dynamac report states that potential
> environmental exposure is 'high.' *This conclusion is not
> supported by the available information.*
>
> ***
>
> Exposure from accidental spills of MTBE could occur, but
> should be regarded as *a minimal possibility*. The closed
> nature of the manufacturing and transportation process
> reduces worker exposure and product loss. Training and
> safety programs also lower the possibility of accidental
> spills. Many current programs at EPA and industry are
> underway to monitor and reduce the possibility of gasoline
> loss from leaking underground storage tanks .... *MTBE
> losses would be extremely small* from this source.
>
> ***
>
> As has been reportedly stated, environmental entry would
> not occur in every stage of the gasoline marketing chain
> . . . . Environmental entry of MTBE from this source
> would be considerably less than the report indicates.
> *MTBE is only slightly soluble* so environmental fate
> projections based on this assumption will not be correct.
> (Emphasis added.)

ARCO's comments, made with Defendants' explicit or implicit approval, were misleading

when made, improperly downplaying the risks of MTBE contamination of groundwater

and omitting material facts known to Defendants at the time.

130. On or about December 17, 1986, the EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The minutes of the meeting indicate that government officials expressed concern over the need to assess the potential for groundwater contamination. The minutes also show that Defendants Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

131. In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants BP Corporation (Amoco), Arco, ChevronTexaco (Chevron and Texaco), Citgo, ExxonMobil (Exxon), Shell, and Sunoco.

132. The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE..., provide technical data to appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule..., [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

133. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated on February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter....the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20....The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

134. Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

135.     At the same time that Arco was telling the EPA that MTBE posed no significant environmental or health problems, Arco admitted to other Defendants that it "had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat of groundwater contamination."

136.     On or around February 27, 1987, the MTBE Committee submitted written comments drafted to convince the EPA not to require additional health and environmental testing of MTBE. The information provided by Defendants was misleading and false. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, and that MTBE has excellent biodegradation characteristics. The MTBE Committee's Statement added:

> There is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

137.     The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants

that do not have the environmental benefits of MTBE.
Thus, requiring long term testing of MTBE will have a
significant adverse environmental and economic impact.

138.    The MTBE Committee acknowledged in its February 27, 1987, comments

that MTBE had not been the subject of long term chronic health testing, but claimed that

such testing was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

[t]he results of a number of acute and sub-chronic health
effect studies are presented in the Health Effects Summary
of this report. These data suggest that the odor detection
level of 700 ppb (approximately 0.7 mg/1) is such that the
organoleptic properties of MTBE are sufficient to protect
against human ingestion of toxic quantities of MTBE.

Defendants took it upon themselves to represent that MTBE has been shown not to be a

health risk without conducting the research needed to reach such a conclusion.

139.    On the issue of the persistence of MTBE, the MTBE Committee stated

that "a Japanese study...reports that MTBE in the presence of gasoline has excellent

biodegradation characteristics." This misrepresentation concerning the biodegradability

of MTBE, which omitted the contrary and more accurate information that MTBE was

already known to be recalcitrant to biodegradation, is further evidence of Defendants'

practice of concealing from government regulators and the public the actual risk that

MTBE poses to groundwater.

140.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and

distributors, including Defendants BP Corporation (Amoco), ExxonMobil (Exxon), and

Sunoco signed a Testing Consent Order with EPA. However, a subsequent notice shows

that after extensive negotiation, the oil industry, including Defendants, convinced the

EPA that additional chemical fate testing was not necessary to determine the

environmental risk posed by MTBE. The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

141. The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiff particularly and the America public generally, and intended to (a) continue to use MTBE without regard to its impact on Plaintiff and the environment, and (b) prevent Plaintiff from becoming aware of the contamination and/or impact of contamination from MTBE.

142. Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The

MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiff. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

> **G.** **Defendants Misled Congress Into Effectively Broadening The Market For MTBE By Including Oxygenate Requirements In The Reformulated Gasoline ("RFG") Program Adopted In The 1990 Amendments To The Clean Air Act**

143.    Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

144.    During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

145.    As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by the industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

146.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.

147.    In 1992, under the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in

gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

148.     The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all available oxygenates.   Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

149.     Safer, more environmentally sound alternatives were available.

## H.     Defendants Misled The Plaintiff And Public, Including AH Downstream Gasoline Handlers, About The Hazards Of Gasoline With MTBE

150.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

151.     On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that: MTBE is different from

other components of gasoline; that it is resistant to biodegradation; and that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

152. In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of Methyl Tertiary Butyl Ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented that there was "no basis to question the continued use of MTBE." Given the information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with the MTBE and concealed known hazards.

153. As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a past problem. This kind of misleading communication utterly failed to alert public officials or non-Defendant persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as "Downstream Handlers") or the general public to the dangers

posed by MTBE and omitted and concealed information required to minimize such dangers.

154. In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

155. This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or even the only, contaminant found in groundwater. Moreover, MTBE contamination is most often judged to be too costly to clean up.

156. Had Defendants warned Downstream Handlers and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

157. Even at this late date, Defendants continue to blend MTBE in their gasoline, continuing the injury to Plaintiff's groundwater with no new safeguards and entirely insufficient warnings, if any.

  **I. Defendants Dramatically Increased Their Use Of MTBE In Gasoline After The Creation Of The RFG Program**

158. National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

159. Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

160. In 1992 Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas as part of the Oxyfuel Program.

161. Defendants then made MTBE the additive of choice throughout Florida when the public and government agencies sought year-round reductions in air pollution caused by cars.

162. In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout Florida when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

163. Until recently, most if not all gasoline pumped in the RFG areas of Florida was laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE is often sold at other locations at the discretion of the oil industry, including Defendants.

164. In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. On

October 13, 1999, Getty Marketing, for example, placed full page ads in the New York

Times stating:

> Protecting our water supply means making a commitment
> to doing business in environmentally-friendly ways. That's
> what we're doing at Getty. We have replaced MTBE with
> **ethanol** in our gasoline because it helps clean the air
> without harming our drinking water.

**J.     MTBE's Degradation Product: TBA**

165.     TBA is used as a raw material in the production of isobutylene, which is

then used to produce MTBE.  TBA is an intermediate product of MTBE biodegradation,

and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA is often

present wherever there is MTBE contamination.

166.     TBA has the same characteristics as MTBE making it a persistent and

pernicious groundwater contaminant.  Some of these similarities include but are not

limited to low solubility (even more so than MTBE), and resistance to biodegradation.

167.     To make matters worse, TBA is even more costly to clean up than MTBE.

In fact, the presence of TBA in water being treated for MTBE may generate compounds

potentially of health and environmental concern, limiting the usefulness of these

technologies and further increasing costs.

168.     In addition, TBA is highly toxic when inhaled and is irritating to the skin,

eyes, and mucous membranes. There is also some evidence that TBA causes cancer, and

it causes kidney and thyroid tumors in rats and mice exposed to it.

169.     Defendants failed to warn Plaintiff, regulators, and the general public that

they often add TBA to their gasoline and that MTBE breaks down into TBA. Further,

Defendants failed to warn Plaintiff of the need to test their water supply for contamination by TBA.

170.    As a result, TBA is present in water supplies all across the country, wherever MTBE contamination exists.

**K.    MTBE Has Had A Predictably Damaging Effect Upon Groundwater and Groundwater Wells**

171.    One can reach and affect the largest number of individuals residing in the United States by adding something to gasoline: everybody drives. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996 MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

172.    Since gasoline containing MTBE at increased levels was introduced in the early 1990's, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

173.    A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the Nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the Nation's drinking water supply."

174.   In its September 15, 1999 report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely.   The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act.   The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells." No actual plans or source of funds for such testing exist in any state, including the State of Florida.

**DEFENDANTS FAILED TO INFORM EPA OF THE
SUBSTANTIAL INFORMATION THAT THEY HAVE
OBTAINED WHICH REASONABLY SUPPORTS THE
CONCLUSION THAT MTBE AND MTBE
CONTAINING GASOLINE PRESENT A
SUBSTANTIAL RISK OF INJURY TO THE HEALTH
OF THE ENVIRONMENT**

175.   On or about March 24, 2000, the EPA published an Advanced Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline ("EPA's Notice of Intent") based on the recommendations of the Blue Ribbon Panel.

176.   In the EPA's Notice of Intent, the agency included requests for the following information:

a.     In order to ensure that EPA has the most recent and accurate data available, EPA requests information regarding incidents of both

releases of gasoline containing MTBE and the detection of MTBE in groundwater, surface waters or drinking water supplies. Comments should include, to the extent possible, the amounts, locations, sources, and types of MTBE releases, and the levels and sources of water resource contamination from MTBE.

b.     EPA is interested in additional information concerning the toxicity of MTBE, the levels at which its taste or odor can be detected in water, [and] the levels at which its taste or odor makes water unacceptable to consumers.

c.     EPA's summary of current MTBE contamination problem suggests that there is significant risk of additional future contamination of water resources by MTBE from gasoline. In order to more comprehensively characterize this risk EPA is requesting comment regarding the likely future occurrence of MTBE contamination in groundwater, surface water, and/or drinking water.

d.     EPA is requesting information regarding the relative contribution of different sources (such as USTs, spills, storm water runoff, air deposition, and marine engines) to present and future MTBE contamination of groundwater, surface water, and drinking water.

e.     EPA is requesting information regarding the cost and efficacy of technologies for remediating soil and drinking water sources that have been contaminated with MTBE. EPA is particularly

interested in examples of remediation efforts that have addressed MTBE contamination, and cost and efficacy comparisons with remediation efforts for other components of gasoline (such as such BTEX). *See* 65 Fed. Reg. 16094, 16107 (Mar. 24, 2000).

177.    At the time of EPA's Notice of Intent, Defendants, as manufacturers, processors or distributors of MTBE or MTBE containing gasoline, had obtained information, which reasonably supports the conclusion that MTBE and MTBE-containing gasoline present a substantial risk of injury to health or the environment ("the Substantial Risk Information"). Nevertheless, and despite the EPA's request for that information in its Notice of Intent, Defendants failed to inform the EPA of that information at that time, and have continued to fail to inform the EPA of that information and of the Substantial Risk Information that Defendants have obtained subsequent to EPA's Notice of Intent.

178.    The Substantial Risk Information that Defendants have obtained, but have not provided to the EPA, includes the following:

a.      Information concerning the amounts, locations, sources and types of MTBE releases, and the levels of water resource contamination from MTBE, developed in connection with the large number of releases of MTBE containing gasoline that have occurred from underground storage tanks at service stations owned or operated by Defendants, as well as from tanks at refineries and terminals storing MTBE-containing gasoline.

b.      Surveys that many Defendants conducted in the mid-1990s to

determine the extent of MTBE contamination of groundwater at their gasoline service stations where there have been releases of gasoline. The results of which showed that upwards of 85% of their service stations with known releases had MTBE contamination of groundwater.

c.      Other "confidential" studies or surveys documenting the extent of MTBE contamination or MTBE's risks to the environment.

d.      Examples of specific Substantial Risk Information that Defendants Chevron Corporation (formerly ChevronTexaco), Chevron U.S.A., Texaco, Inc., Texaco Refining & Marketing Inc., TRM Company, and TRMI (formerly Texaco refining & Marketing (East), Inc.) (collectively "Chevron-Texaco") obtained is set forth in the Notice Letter to Chevron-Texaco dated August 4, 2006, attached as Exhibit A to this Complaint and incorporated as if here fully set forth herein.

e.      Examples of specific Substantial Risk Information that Defendant ExxonMobil obtained is set forth in the Notice Letter to ExxonMobil dated July 28, 2006, attached as Exhibit B to this Complaint and incorporated as if here fully set forth.

f.      Examples of specific Substantial Risk Information that Defendants Lyondell Chemical Company (formerly known as Lyondell Petrochemical Company and as Arco Chemical Company)

obtained is set forth in the Notice Letter to Lyondell dated August 4, 2006, attached as Exhibit C to this Complaint and incorporated as if here fully set forth.

g.   Examples of specific Substantial Risk Information that Defendants Shell Oil Company, Shell Oil Products Company, LLC, Shell Trading (US) Company, and Equilon Enterprises, LLC (collectively "Shell") obtained is set forth in the Notice Letter to Shell dated August 4, 2006, attached as Exhibit D to this Complaint and incorporated as if here fully set forth.

179.   Defendants knew or should have known, and continue to know or should know, that the EPA has not been informed of the Substantial Risk Information that Defendants have obtained. Nevertheless, Defendants have failed, and continue to fail, to inform the EPA of that information.

### IT IS IMPOSSIBLE TO IDENTIFY WHICH MANUFACTURERS' GASOLINE POSES A THREAT OF MTBE CONTAMINATION OR HAS ALREADY CAUSED MTBE CONTAMINATION OF ANY PARTICULAR AQUIFER OR WELL

180.   Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

181.   The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Florida.

182.    A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners.

183.    Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

184.    Defendants are also jointly and severally liable because they conspired to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiff's expense, to contaminate groundwater proximate to Plaintiff's aquifers and wells, and to avoid liability for such contamination.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

185.    Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in Florida and are jointly responsible for the increased threat to groundwater in Florida and for causing the injuries complained of in this Complaint. Market share liability attaches to all Defendants and that liability of each should be assigned according to its percentage of the market for gasoline containing MTBE in Florida at issue in this Complaint. MTBE is fungible; it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment; and, each of these Defendants participated in a state-wide and national

market for gasoline with MTBE during the relevant time period at issue in this Complaint.

186. Concert of action liability attaches to all Defendants each of which participated in a common plan to commit the intentional torts alleged herein and acted tortiously in pursuance of the common plan.

187. Enterprise liability attached to all of the named Defendants.

## CONSPIRACY

188. Defendants actually knew of the hazards which MTBE posed to groundwater throughout Florida to wells owned by Plaintiff.

189. Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

    a.    creating a market for MTBE despite knowledge of the hazards which MTBE poses to groundwater throughout Florida;

    b.    concealing the nature of MTBE, and its impact on Plaintiff and the environment; and

    c.    maximizing profits in a way that Defendants knew would require them to contaminate Plaintiff's wells.

190. Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

    a.    intentionally representing to the EPA and the public that MTBE

was safe and did not pose a risk to groundwater;

b.    concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c.    concealing the dangers of MTBE from Downstream Handlers and consumers;

d.    using their considerable resources to fight UST legislation; and

e.    collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program as MTBE was the most profitable oxygenate for Defendants.

191.    As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation:

a.    Has posed and continues to pose a threat to Plaintiff's water and wells;

b.    Has required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

c.    Has contaminated groundwater proximate to Plaintiff's production wells;

d.   Will require remediation of MTBE groundwater contamination should the threat to Tampa Bay Water's production wells be realized or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

e.   Will diminish confidence in, and the use and enjoyment of, Plaintiff's water should the threat to Tampa Bay Water's production wells and property be realized because the water and well water will be less safe than water from other sources; and

f.   Will diminish Plaintiff's property value due to threatened contamination or actual contamination should the threat to Tampa Bay Water's production wells be realized.

## AS AND FOR A FIRST CAUSE OF ACTION:
## <u>PUBLIC NUISANCE</u>

192.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

193.   Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

194.   Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, unleashed massive, long-lasting and still spreading contamination of groundwater and drinking water wells, having concealed the

threat from all, thereby causing MTBE contamination of groundwater. This contamination has migrated into groundwater and Plaintiff's production wells.

195.    By their conduct, Defendants violated and/or threaten to violate public rights to pure drinking water, as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

196.    Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused injury to Plaintiff in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance. MTBE presents a serious health hazard, because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

197.    Defendants' conduct has also injured the property, health, safety and/or comfort of a considerable number of persons.

198.    Gasoline and MTBE contamination, both real and immediate, constitutes a current existing, as well as prospective public nuisance.

199.    As owners of water production wells and purveyors of drinking water, Plaintiff suffers injuries different in kind from the community at large precisely because it relies upon production wells for its business.

200.    Plaintiff's production wells are solely dependent upon groundwater.

201.    Plaintiff's special injuries therefore include: additional testing costs, potential loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the

underground aquifers, groundwater and well water have been rendered less certain, safe and reliable to the other sources of water.

202.     Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff.

203.     As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries common to the public at large and additional special injuries from actual contamination of groundwater proximate to, and threatened contamination of, Plaintiff's production wells.

## AS AND FOR A SECOND CAUSE OF ACTION: STRICT LIABILITY FOR DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

204.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

205.     Defendants during the relevant time period were manufacturers, refiners, formulators, sellers, marketers and suppliers of petroleum products including gasoline containing MTBE.

206.     As manufacturers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

207. When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective and unreasonably dangerous for its intended purpose and foreseeable transportation, storage, handling, and uses for the following reasons:

      a.      unintended discharges of gasoline are commonplace throughout Florida;

      b.      MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

      c.      when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

      d.      MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

      e.      when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is resistant to biodegradation and bioremediation;

      f.      very low concentrations of MTBE will ruin the taste and smell of water; and

      g.      MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

208. Defendants had knowledge of the risks and failed to use reasonable care in the design of gasoline containing MTBE.

209.    Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, Downstream Handlers and the general public exercising reasonable care.

210.    The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

211.    Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

212.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

213.    Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

214.    Gasoline containing MTBE reached consumers and the environment in a condition substantially unchanged from that in which it left Defendants' control.

215.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation:

        a.      Has posed and continues to pose a threat to Plaintiff's water and

wells;

b.      Has required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

c.      Has contaminated groundwater proximate to Plaintiff's production wells;

d.      Will require remediation of MTBE groundwater contamination should the threat to Tampa Bay Water's production wells be realized or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

e.      Will diminish confidence in, and the use and enjoyment of, Plaintiff's water should the threat to Tampa Bay Water's production wells and property be realized because the water and well water will be less safe than water from other sources; and

f.      Will diminish Plaintiff's property value due to threatened contamination or actual contamination should the threat to Tampa Bay Water's production wells be realized.

## AS AND FOR A THIRD CAUSE OF ACTION:
### <u>FAILURE TO WARN</u>

216.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

217. As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by MTBE.

218. Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without notice of defects related to the hazards, which MTBE poses to groundwater and wells.

219. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

    a. unintended discharges of gasoline are commonplace;

    b. MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

    c. when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    d. MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    e. when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    f. at extremely low concentrations, MTBE can have a distressing and

objectionable taste and odor that renders water unusable;

g.      MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

h.      MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

i.      MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE; MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE.

j.      MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.      the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

220.    Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, Downstream Handlers, and/or the general public.

221.     Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff. Plaintiff and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

222.     As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

> a.     Posed and continues to pose a threat to Plaintiff's water and wells;
>
> b.     Required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;
>
> c.     Has contaminated groundwater proximate to Plaintiff's production wells;
>
> d.     Will require remediation of MTBE groundwater contamination should the threat to Tampa Bay Water's production wells be realized or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;
>
> e.     Will diminish confidence in, and the use and enjoyment of, Plaintiff's water should the threat to Tampa Bay Water's production wells and property be realized because the water and

well water will be less safe than water from other sources; and

f.    Will diminish Plaintiff's property value due to threatened contamination or actual contamination should the threat to Tampa Bay Water's production wells be realized.

## AS AND FOR A FOURTH CAUSE OF ACTION:
## NEGLIGENCE

223.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

224.   As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

225.   Defendants had a duty and the financial and technical means to test MTBE, gasoline containing MTBE, and to warn Plaintiff, public officials, Downstream Handlers and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

226.   At all times relevant to this litigation, Defendants knew or should have known that:

a.    unintended discharges of gasoline are commonplace;

b.    MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

c. when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

d. MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

e. when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

f. very low concentrations of MTBE can ruin the taste and smell of water;

g. MTBE is a known animal carcinogen and a possible human carcinogen;

h. MTBE greatly increases the importance of preventing leaks of gasoline;

i. MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

j. MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

k. MTBE creates a need for more regular testing and monitoring of wells for early detection of gasoline containing MTBE; and

l. the foregoing facts relating to the hazards which MTBE poses to

groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

227.    Defendants negligently breached their duties of due care to Plaintiff, Downstream Handlers, and the general public by, among other things:

a.    using MTBE as an octane-booster and oxygenate;

b.    failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.    failing to adequately test, identify and remediate wells that are contaminated with MTBE;

d.    forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

e.    voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

f.    failing to design gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiff;

g.    marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the

environmental and potential health hazards posed by MTBE;

h.    failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

i.    failing to curtail or reduce MTBE's manufacture and distribution;

j.    failing to instruct Plaintiff, Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE;

k.    failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

l.    negligently releasing MTBE into the environment; and

m.    failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE, about the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and use, and about how to remediate such spills and leaks promptly.

228.    As a direct and proximate result of Defendants' above-described negligence, MTBE at all times relevant to this litigation:

a.    Has posed and continues to pose a threat to Plaintiff's water and wells;

b.    Has required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

c.    Has contaminated groundwater proximate to Plaintiff's production wells;

d.    Will require remediation of MTBE groundwater contamination should the threat to Tampa Bay Water's production wells be realized or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

e.    Will diminish confidence in, and the use and enjoyment of, Plaintiff's water should the threat to Tampa Bay Water's production wells and property be realized because the water and well water are now less safe than water from other sources; and

f.    Will diminish Plaintiff's property values due to threatened contamination or actual contamination should the threat to Tampa Bay Water's production wells be realized.

### AS AND FOR A FIFTH CAUSE OF ACTION:
### <u>PRIVATE NUISANCE</u>

229.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

230.    The groundwater system proximate to the zone of influence in the groundwater that supplies Plaintiff's production wells has been contaminated by MTBE posing a threat to Plaintiff's production wells as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

231. Gasoline and MTBE contamination caused by Defendants' conduct will damage Plaintiff's property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property should the threat from the MTBE contamination to Plaintiff's production wells be realized.

232. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff will suffer injuries from contamination of the underground aquifers and the groundwater supplying Plaintiff's production wells should the threat from the MTBE contamination to Plaintiff's production wells be realized.

## PUNITIVE DAMAGES

233. Plaintiff realleges and reaffirms each and ever allegation set forth in all preceding paragraphs as if fully stated herein.

234. The conduct of the Defendants, including but not limited to:

    a. intentionally misrepresenting the properties of MTBE and gasoline containing MTBE;

    b. marketing and promoting gasoline containing MTBE as environmentally safe and beneficial;

    c. issuing no warnings and failing to divulge material information concerning the risks of MTBE; and

    d. knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers, groundwater and production in areas using high MTBE-content gasoline caused

great harm to Plaintiff and was outrageous and demonstrating a conscious disregard of Plaintiff's customers' safety with implied malice and oppression for which punitive and exemplary damages should be imposed.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants for:

1.    Injunctive and equitable relief as the Court deems appropriate including:

    a.    investigation;

    b.    testing and monitoring;

    c.    alternative water;

    d.    well head treatment;

    e.    early warning system to detect MTBE before it reaches a well;

    f.    well head protection program;

    g.    preventing Defendants from engaging in further releases of MTBE;

    h.    compelling TSCA Defendants immediately to provide to the EPA all;

    i.    Substantial Risk Information in Defendants' possession, custody, or control;

    j.    compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater; and

    k.    taking all further measures necessary to remedy the MTBE contamination and to protect the groundwater, public health and

safety from further MTBE contamination.

2.    Compensatory damages according to proof including for the above, loss of consumer confidence and resulting business in the amount of:

    a.    Sixty Million Dollars ($60,000,000) on the First Cause of Action;

    b.    Sixty Million Dollars ($60,000,000) on the Second Cause of Action;

    c.    Sixty Million Dollars ($60,000,000) on the Third Cause of Action;

    d.    Sixty Million Dollars ($60,000,000) on the Fourth Cause of Action;

    e.    Sixty Million Dollars ($60,000,000) on the Fifth Cause of Action; and

3.    Punitive damages as a result of Defendants' above-described conduct in the amount of:

    a.    Two Hundred Fifty Million ($250,000,000) on the First Cause of Action;

    b.    Two Hundred Fifty Million ($250,000,000) on the Second Cause of Action;

    c.    Two Hundred Fifty Million ($250,000,000) on the Third Cause of Action;

    d.    Two Hundred Fifty Million ($250,000,000) on the Fourth Cause of Action; and

    e.    Two Hundred Fifty Million ($250,000,000) on the Fifth Cause of Action.

4.    Interest on the damages according to law;

5.    Costs and disbursements of this lawsuit; and

6.    Interest on the damages according to law; and

7.    Any other and further relief as the Court deems just, proper and equitable.

Respectfully submitted this 5th day of April 2007.

**NEWSOME LAW FIRM**

*Attorneys for the Plaintiff Tampa Bay Water*

/s/ C. Richard Newsome
**C. RICHARD NEWSOME, ESQUIRE**
Florida Bar No.:  827258
**ANDREW F. KNOPF, ESQUIRE**
Florida Bar No.:  658871
20 North Orange Avenue, Suite 800
Orlando, FL  32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282

**NAPOLI BERN RIPKA & ASSOCIATES, LLP**
*Attorneys for the Plaintiff Tampa Bay Water*

/s/ Marc Jay Bern
**MARC JAY BERN**
3500 Sunrise Hwy., Suite T-207
Great River, New York 11739
Telephone: (212) 267-3700